Red Fox Future, LLC v. Holbrooks, 2014 NCBC 8.

STATE OF NORTH CAROLINA

POLK COUNTY

IN THE GENERAL COURT OF
JUSTICE
SUPERIOR COURT DIVISION
11 CVS 108

RED FOX FUTURE, LLC and
ANDREY MEDVEDEV,

          Plaintiffs,

v.

GENE S. HOLBROOKS, HOME
REALTY CO. & INSURANCE AGENCY,
INC., TONY JACKSON, and RED FOX
PROPERTIES, LLC,

          Defendants.

ORDER AND OPINION

*Patla, Straus, Robinson, & Moore P.A. by Richard S. Daniels for Plaintiffs Red Fox Future, LLC, and Andrey Medvedev.*

*Tuggle Duggins P.A. by Robert C. Cone for Defendants Gene S. Holbrooks and Home Realty Co. & Insurance Agency, Inc.*

*David Lloyd Law Office by David A. Lloyd for Defendants Tony Jackson and Red Fox Properties, LLC.*

Murphy, Judge.

{1}    THIS MATTER is before the Court on Defendants Gene S. Holbrooks ("Holbrooks") and Home Realty Co. & Insurance Agency, Inc.'s ("Home Realty") (collectively, "Defendants") Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Motion I"); Plaintiffs Red Fox Future, LLC ("Future") and Andrey Medvedev's ("Medvedev") (collectively, "Plaintiffs") Motion for Partial Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Motion II"); and Defendants' Motion to Exclude or Limit the Testimony of John R. Markel, CPA ("Motion III") in the above-captioned case. Having considered the Motions, the briefs and exhibits filed in support and opposition to the Motions, and the arguments of counsel made at a hearing held on March 21, 2013, the Court hereby GRANTS Motion I, GRANTS in part and DENIES in part Motion II, and GRANTS Motion III.

# I.
## PROCEDURAL HISTORY

{2}    On April 15, 2011, Plaintiffs filed their Complaint in this action bringing claims against Holbrooks, Home Realty, Tony Jackson ("Jackson"), and Red Fox Properties, LLC ("Properties") for fraud, unfair and deceptive trade practices, conversion, rescission, accounting, and recovery of assets and penalties related to a failed venture to purchase a country club and golf course.

{3}    Subsequently, the case was designated a complex business case, and assigned to this Court on June 3, 2011.

{4}    On July 1, 2011, Defendants filed their Answer and Counterclaims alleging causes of action against Plaintiffs for breach of contract, conversion/trespass to chattels, fraud, unfair and deceptive trade practices, breach of fiduciary duty, constructive fraud, unjust enrichment, accounting, and specific performance.  On August 29, 2011, Jackson and Properties filed their Amended Answer and Counterclaims.

{5}    Thereafter, on October 15, 2012, Defendants filed Motion I seeking summary judgment on all claims asserted against them in the Complaint.  That same day, Plaintiffs filed Motion II seeking partial summary judgment on all of Defendants' counterclaims against Medvedev and Defendants' counterclaims against Future for breach of fiduciary duty, constructive fraud, unfair and deceptive trade practices, punitive damages, and specific performance.  Plaintiffs also requested a cap on Defendants' recovery for any award in excess of $650,000.

{6}    Simultaneously with Motion I, Defendants also filed a Motion III requesting the Court exclude the testimony of Plaintiffs' expert witness, John R. Markel, CPA ("Markel").

{7}    The parties briefed all three Motions, and the Court held a hearing on March 21, 2013.

## II.

## FACTUAL BACKGROUND

{8} On a motion for summary judgment under Rule 56 of the North Carolina Rules of Civil Procedure, the Court does not make findings of fact to resolve an issue of material fact. "[S]ummary judgment presupposes that there are no triable issues of material fact." *Hyde Ins. Agency v. Dixie Leasing*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 165 (1975). Therefore, the Court recites only those material facts that the Court concludes are not disputed, and which justify entering judgment. *Id.*

{9} Holbrooks is the owner and president of Home Realty, a North Carolina corporation that develops real estate. (Holbrooks Dep. 10:9–25, Apr. 10, 2012.) In 1992, Home Realty purchased Red Fox Country Club (the "Club"), which Holbrooks managed until 2009. (Holbrooks Dep. 14:23.)

{10} In 1992, Defendants hired Jackson to work at the Club, and thereafter, Jackson worked closely with Holbrooks. (Holbrooks Dep. 42:20–25.)

{11} During the summer of 2009, Jackson met Medvedev, a Russian businessman looking to settle in North Carolina. (Medvedev Dep. 104:20–21, Apr. 11, 2012.) Although Medvedev had no experience with the Club, Jackson and Medvedev agreed to pursue negotiations with Defendants to purchase the Club. To do so, Medvedev and Jackson formed Future, a South Carolina limited liability company. (Pls.' Opp. Mot. I Ex. 11.)

{12} On October 15, 2009, Jackson and Medvedev signed the Operating Agreement for Future. Pursuant to Article 5 of the Operating Agreement, in addition to becoming the initial managers of Future, Medvedev and Jackson also served as Chief Executive Officer and Chief Operating Officer, respectively. (Pls.' Opp. Mot. I Ex. 11 §§ 5.1, 5.3.) The Operating Agreement also provided that each member would make an initial capital contribution – Medvedev agreed to contribute $1,620,000 and Jackson agreed to contribute $650,000. (Pls.' Opp. Mot. I Ex. 11 Ex. A.) By signing the Operating Agreement, Medvedev and Jackson also acknowledged that they were "capable of evaluating the merits and risks of investment in [Future] . . . [, understood] that investment in [Future] constitute[d] a

speculative investment . . . [, and] had opportunity to seek the advice of [their] own independent legal counsel . . . ." (Pls.' Opp. Mot. I Ex. 11 § 3.7(e) (emphasis removed).)

{13} The parties negotiated and agreed that Future would purchase the Club for $2,850,000, and that $650,000 of the purchase price would be financed by Defendants as a loan to Jackson. (Compl. Ex. A § 2.) As part of the deal, the $650,000 loan to Jackson would also serve as Jackson's initial capital contribution to Future. Although the loan was not secured, Jackson testified that he agreed to procure a $650,000 life insurance policy on his own life, payable to Home Realty in the event of his death. (Jackson Dep. 120:17–122:16, Apr. 11, 2012; Holbrooks Dep. 119:6–122:18.)

{14} On August 29, 2009, to memorialize their agreement, Defendants and Future entered into the Purchase Agreement (the "Agreement"). (Compl. Ex. A.) By the terms of the Agreement, Future committed to buy the Club and all associated property. The Agreement further provided that Jackson "delivered his Promissory Note to [Defendants] to evidence" the loan between them, and that "[t]he Promissory Note . . . will be free of all claims by the Club or [Future]." (Compl. Ex. A § 2.) At closing, the $650,000 loan to Jackson would be applied to the purchase price and the remaining $2,200,000 of the purchase price would become due. Prior to closing, however, Future agreed to make an earnest money deposit of $50,000, which the Agreement stipulated would be refundable if the parties did not close by October 15, 2009. If the parties did not close by that date, the Agreement provided that Future could extend the closing date until no later than December 10, 2009, upon payment of $100,000 as an additional nonrefundable deposit and the initial deposit of $50,000 would become nonrefundable. The Agreement further specified that, once Future paid the required deposit, Defendants could "do whatever [they chose]" with the money. (Compl. Ex. A § 5.) If Future opted to extend the closing date under this provision, then it would also take possession of the Club, receive all revenues from the Club's operations, pay all operating

expenses of the Club, and pay Defendants 5% annually on the remaining purchase price, less the nonrefundable deposits and the loan to Jackson.

{15} Medvedev argues that Jackson convinced him additional investors could be recruited to contribute the remaining $580,000 needed to close on the Club which would be combined with the $1,620,000 contributed by Medvedev and the $650,000 loan to Jackson. However, it appears that only one other investor agreed to invest in the project. And, without sufficient investors, Future failed to close on October 15, 2009, and instead, exercised its option to extend the closing date to December 10, 2009.

{16} As contemplated in the Agreement, Future thereafter took possession of the Club, began collecting its revenues, assumed the obligation to pay the operating expenses, and paid an additional $100,000 deposit to Defendants. Both the original $50,000 deposit and the new $100,000 deposit then became nonrefundable. (Compl. Ex. A § 5.)

{17} Despite the closing extension, Future struggled to generate any new investors or financing in time to close on the Club. As a result, Future requested an additional extension. Defendants agreed, and the parties executed the Addendum to the Agreement (the "Addendum"), which extended the closing date to April 1, 2010. (Compl. Ex. B.) As consideration, Future paid an additional $500,000 nonrefundable deposit to Defendants that would be credited to the balance of the purchase price at closing. Future would also continue to occupy and operate the Club. (Compl. Ex. B.)

{18} Despite this extension, Future again failed to close on April 1, 2010, but continued to occupy and run the Club. On May 10, 2010, Defendants sent a letter to Jackson, Future's registered agent, notifying Future of the breach and of Defendants' intention to terminate the Agreement and to retain all the nonrefundable deposits "as liquidated damages" (the "Termination Letter"). (Compl. Ex. C.) Defendants also allege that Future neglected to pay all the Club's operating expenses while in possession.

{19}   Apparently, after the deal fell apart, Defendants allowed Jackson to continue operating the Club and began negotiating a new deal with Jackson to purchase the Club without Plaintiffs' involvement. (Holbrooks Dep. 52:5–25.) To facilitate the deal, Jackson formed Properties, a new limited liability company. (Jackson Dep. 90:8–25.) However, Defendants, Jackson, and Properties never consummated the new deal, and Defendants ultimately listed the Club for sale at a price of $2,200,000. (Pls.' Supp. Mot. II Ex. N.)

{20}   Plaintiffs argue that Defendants and Jackson defrauded Medvedev into investing in the project, and defrauded Future into entering the Agreement and Addendum and paying the nonrefundable deposits. Specifically, Plaintiffs allege that Defendants and Jackson misrepresented that Jackson had borrowed $650,000 from Defendants to be applied to the purchase of the Club when, in fact, Defendants never intended to loan Jackson the money. Plaintiffs argue that Defendants always intended the purchase price to be $2,200,000, not $2,850,000, and that Defendants and Jackson used the phantom loan to convince Plaintiffs to make investments in the project while also giving Jackson a stake in Future.

{21}   Defendants and Jackson refute these claims. And, in response, Defendants allege that Plaintiffs: (i) breached the Agreement by not closing on April 1, 2010; (ii) improperly retained proceeds from the unauthorized sale of some 60 golf carts and from an insurance payout after wind damage to property at the Club; (iii) incurred unnecessary expenses by leasing computer software and golf carts; and (iv) left certain vendors unpaid. In his deposition, Jackson testified under oath that he handled all the deposits and oversaw the sale of the golf carts. (Jackson Dep. 127:12–128:23, 134:25–135:2, 137:10–13.)

{22}   After Defendants took back possession of the Club, and the pleadings closed in this matter, it appears that one of the buildings on the property – the clubhouse – burned down in a fire.

## III.
## LEGAL STANDARD

{23} "The purpose of summary judgment is to determine whether any issues of material fact exist, and if not, eliminate the necessity of a full trial where only questions of law are involved." *Strickland v. Lawrence*, 176 N.C. App. 656, 661, 627 S.E.2d 301, 305 (2006) (citing *Foster v. Winston-Salem Joint Venture*, 303 N.C. 636, 641–42, 281 S.E.2d 36, 40 (1981)). Thus, the Court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c).

{24} "The movant has the burden of establishing the absence of any triable issues of fact." *Strickland*, 176 N.C. App. at 661, 627 S.E.2d at 305. This burden can be met in one of two ways: "(1) 'by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense'; or (2) 'by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim.'" *Id.* (quoting *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000)).

{25} In ruling on a summary judgment motion, the court must view the evidence in the light most favorable to the nonmoving party. *See Wilmington Star-News v. New Hanover Reg'l Med. Ctr.*, 125 N.C. App. 174, 178, 480 S.E.2d 53, 55 (1997) (citation omitted).

## IV.
## ANALYSIS
## A.
## MOTION I
## 1.
## FRAUD (FUTURE AND MEDVEDEV)

{26} To succeed on a claim for fraud, Plaintiffs must prove the following:

(1) material misrepresentation of a past or existing fact; (2) the representation must be definite and specific; (3) made with knowledge

of its falsity or in culpable ignorance of its truth; (4) that the misrepresentation was made with intention that it should be acted upon; (5) that the recipient of the misrepresentation reasonably relied upon it and acted upon it; and (6) that there resulted in damage to the injured party.

*Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999) (quoting *Rosenthal v. Perkins*, 42 N.C. App. 449, 451–52, 257 S.E.2d 63, 65 (1979)).

{27}  Furthermore, if the plaintiff could have discovered the truth upon inquiry, then he must show that "he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Id.* (citation omitted).

{28}  Here, Plaintiffs argue that Defendants misrepresented their intent to loan Jackson $650,000 towards the purchase of the Club.  Plaintiffs' theory is that Defendants and Jackson created this phantom loan to induce significant investments and deposits from Plaintiffs and provide Jackson a stake in Future, when in reality the actual purchase price for the Club was $2,200,000, not $2,850,000.

{29}  The flaw in Plaintiffs' theory is that, even if this scheme proved to be true, the record reveals no injury resulting from these representations.  Plaintiffs do not allege or put forward evidence that Plaintiffs would have been in anyway liable for the $650,000 if Defendants did not loan Jackson the money, nor do they argue that Defendants would not have closed on the deal if the loan fell through.  Plaintiffs only contention is that the alleged misrepresentations caused them to make significant investments and deposits, which were lost when the deal did not close.

{30}  However, Plaintiffs do not dispute that they negotiated and agreed to the $2,850,000 purchase price and the accompanying terms in the Agreement.  Whether Defendants and Jackson intended the loan to be real or not is irrelevant.  Indeed, even if Defendants simply discounted the purchase price by $650,000 as a gift to Jackson, the result would be the same – Plaintiffs would still get the benefit of $650,000 off the purchase price of the Club.  This would remain the case even if

Defendants loaned Jackson the money, but thereafter, Jackson failed to pay the loan or Defendants never collected the debt. In that scenario, Plaintiffs still get the benefit of the $650,000 paid towards the purchase of the Club. Any recourse on the loan would be between Defendants and Jackson, given that the parties agreed Plaintiffs would have no liability for the debt.

{31} The Court does not find anything in the record linking the representations regarding the loan to Jackson to Plaintiffs' ultimate loss. Based on the record, it appears that the sole cause of Plaintiffs' loss was the lack of sufficient investors to close on the deal. Therefore, the Court concludes that no issues of material fact remain as to whether the alleged misrepresentations caused any injury to Plaintiffs. As such, Plaintiffs' claim for fraud fails as a matter of law.

{32} Accordingly, the Court GRANTS Motion I as to Plaintiffs' claims for fraud, and DISMISSES these claims with prejudice.

2.

UNFAIR AND DECEPTIVE TRADE PRACTICES (FUTURE AND MEDVEDEV)

{33} "In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001).

{34} Plaintiffs based their claim for unfair and deceptive practices on the same facts as their fraud claim. Having concluded that there is no genuine issue of material fact as to whether Defendants' alleged acts proximately caused injury to Plaintiffs, the Court similarly concludes that Plaintiffs have failed to establish an essential element of their unfair trade practices claim. Accordingly, the Court GRANTS Motion I as to Plaintiffs' claims for unfair and deceptive trade practices, and DISMISSES these claims with prejudice.

3.

## RESCISSION (FUTURE)

{35} Under its claim for rescission, Future seeks to rescind the Agreement based on unconscionability. "To find unconscionability there must be an absence of meaningful choice on [the] part of one of the parties together with contract terms which are unreasonably favorable to the other." *Martin v. Sheffer*, 102 N.C. App. 802, 805, 403 S.E.2d 555, 557 (1991). In other words, the party seeking to rescind an unconscionable contract must show both procedural and substantive unconscionability.

> Procedural unconscionability involves 'bargaining naughtiness' in the formation of the contract, i.e., fraud, coercion, undue influence, misrepresentation, inadequate disclosure. Substantive unconscionability . . . involves the harsh, oppressive, and one-sided terms of a contract, i.e., inequality of the bargain. The inequality of the bargain, however, must be so manifest as to shock the judgment of a person of common sense, and . . . the terms . . . so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other.

*Raper v. Oliver House, LLC*, 180 N.C. App. 414, 420, 637 S.E.2d 551, 555 (2006).

{36} To support its claim of procedural unconscionability, Future appears to allege fraudulent inducement, drawing on the same facts underlying the claim for fraud. The Court, however, dismissed Plaintiffs' claim for fraud given the lack of evidence linking the alleged misrepresentation to any injury suffered by Plaintiffs. Furthermore, the Court finds no other evidence in the record demonstrating that Future was in some way denied a meaningful choice in executing the Agreement. Nonetheless, even if Future could rely on the alleged misrepresentation to support procedural unconscionability, there is no evidence of a shocking inequality in the terms of the Agreement or the Addendum to support substantive unconscionability.

{37} This was a bargained-for exchange with benefits and risks on both sides. Once the parties struggled to find investors, Future was free to withdraw from the Agreement and get the initial deposit back. However, Future chose to proceed and extend the closing date, not once but twice. And, in return, Future got possession of the Club and the benefit of the revenues produced by the Club's operation until

Defendants ultimately terminated the deal. Simply because the deal ended badly for Future does not give the Court grounds to rescind the contract. "People should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain." *Blaylock Grading Co., LLP v. Smith*, 189 N.C. App. 508, 511, 658 S.E.2d 680, 682 (2008). Without any evidence to support unconscionability, the Court concludes that no issues of fact remain on Future's claim for rescission.

{38} Accordingly, the Court GRANTS Motion I as to Future's claim for rescission, and DISMISSES this claim with prejudice.

4.

RECOVERY OF PENALTY (FUTURE)

{39} Under this claim, Future seeks to recover the nonrefundable deposits paid to Defendants pursuant to the Agreement and the Addendum. Specifically, Future argues that the deposits constitute unenforceable penalties under a liquidated damages analysis.

> *Liquidated damages* are a sum which a party to a contract agrees to pay or a deposit which he agrees to forfeit, if he breaks some promise, and which, having been arrived at by a good-faith effort to estimate in advance the actual damage which would probably ensue from the breach, are legally recoverable or retainable . . . if the breach occurs. A *penalty* is a sum which a party similarly agrees to pay or forfeit . . . but which is fixed, not as a pre-estimate of probable actual damages, but as a *punishment*, the threat of which is designed to prevent the breach, or as *security* . . . to insure that the person injured shall collect his actual damages.

*Knutton v. Cofield*, 273 N.C. 355, 361, 160 S.E.2d 29, 34 (1968) (quotation omitted and alteration original). While a liquidated damages provision may be enforceable, courts will not impose a penalty. *Id.*

{40} In this case, neither the Agreement nor the Addendum indicate that the nonrefundable deposits were in any way intended to be liquidated damages. The Agreement provides that the deposits became nonrefundable upon Future's exercise of its option to extend the closing, and that Defendants could freely do whatever they chose with the money after that point, regardless of Future's performance.

(Compl. Ex. A § 5.) Furthermore, the parties agreed in the Addendum that the $500,000 nonrefundable deposit constituted consideration for the additional extension, not an estimated amount of damage that Future would forfeit if it failed to close. (Compl. Ex. B.) Nothing in the Agreement or the Addendum conditions Defendants' retention of the deposits on Future's breach nor restricts Defendants' ability to pursue other damages. A thorough review of the Agreement and the Addendum reveals that the nonrefundable deposits "did not serve as liquidated damages because it was not set out in the contract[s] as the amount agreed upon which would serve as liquidated damages." *Chris v. Epstein*, 113 N.C. App. 751, 757, 440 S.E.2d 581, 585 (1994). Therefore, the Court need not engage in an analysis of whether the liquidated damages are unenforceable penalties because the contracts do not contain a provision for liquidated damages.[1] As a result, Future's claim for recovery of penalty fails as a matter of law.

{41} Accordingly, the Court hereby GRANTS Motion I as to Future's claim for recovery of penalty, and DISMISSES the claim with prejudice.

B.

MOTION II

1.

CAP ON RECOVERY

{42} In Motion II, Plaintiffs request summary judgment on all of Defendants' claims to the extent that Defendants seek recovery in excess of $650,000. Specifically, Plaintiffs argue that the nonrefundable deposits totaling $650,000 are the maximum amount that Defendants can recover because the deposits constituted either liquidated damages or unenforceable penalties under the Agreement and the Addendum. However, the Court has already determined that the provisions in the Agreement and the Addendum for nonrefundable deposits did not represent

---

[1] This remains the case despite Defendants use of the term "liquidated damages" in the Termination Letter. In construing a contract, the Court looks to the four corners of the agreement to determine the intent of the parties at the moment of execution. *Lane v. Scarborough*, 284 N.C. 407, 409–10, 200 S.E.2d 622, 624 (1973). Therefore, the Court is not swayed by the language in the Termination Letter, which was not part of either the Agreement or the Addendum and was sent months after execution.

liquidated damages.  As such, Plaintiffs' argument for a cap on damages fails for the same reasons.  Therefore, the Court hereby DENIES Motion II as to Plaintiffs request for a cap on Defendants' recoverable damages.

2.

BREACH OF FIDUCIARY DUTY AND CONSTRUCTIVE FRAUD AGAINST FUTURE

{43}   Plaintiffs argue that they are entitled to summary judgment on Defendants' claims against Future for breach of fiduciary duty and constructive fraud because no fiduciary duty exists between Future and Defendants.  The existence of a fiduciary relationship is an essential element of both a claim for breach of fiduciary duty and a claim for constructive fraud.  *See Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001); *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981).

> Such a relationship has been broadly defined by [the North Carolina Supreme Court] as one in which 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . ., [and] it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.'

*Dalton*, 353 N.C. at 651–52, 548 S.E.2d at 707–08 (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)) (quotation omitted and alteration original).

{44}   "Although our courts have broadly defined fiduciary relationships, no such relationship arises absent the existence of dominion and control by one party over another."  *Kaplan v. O.K. Techs., LLC*, 196 N.C. App. 469, 474, 675 S.E.2d 133, 137 (2009).  Thus, special circumstances must exist such that "one party figuratively holds all the cards . . . ."  *Id.* at 475, 675 S.E.2d at 138 (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998)).  However, "[g]enerally, the existence of such a relationship is determined by specific facts and circumstances, and is thus a question of fact for the jury."  *Stamm v. Salomon*, 144 N.C. App. 672, 680, 551 S.E.2d 152, 158 (2001).

{45}   Defendants argue that Future owed them a fiduciary duty by virtue of Future's possession of the Club.  Indeed, it appears from the record that the

Agreement entitled Future to possession of the Club and control of its operations upon the exercise of Future's option to extend the closing deadline, and that Future in fact operated the Club from October 2009 until May 2010. Arguably, this put Future in a position of domination and control because there was no guarantee that the deal would close. In that situation, the Club would be returned to Defendants in whatever condition Future left it. Thus, Defendants argue that they were at Future's mercy after entrusting Future with the operation of the Club.

{46} On the other hand, as Future points out, this was the deal reached between the parties, and "a fiduciary relationship will not exist between parties in equal bargaining positions dealing at arm's length, even though they are mutually interdependent businesses." *Strickland v. Lawrence*, 176 N.C. App. 656, 662, 627 S.E.2d 301, 306 (2006). However, unlike the case in *Strickland*, it does not appear that Defendants maintained an active role in the day-to-day management of the Club during Future's time at the helm. As such, the Court concludes that there are material questions of fact left to be resolved regarding the existence of a fiduciary relationship between Defendants and Future, and therefore, Defendants' claims for breach of fiduciary duty and constructive fraud against Future should survive at this stage.

{47} Accordingly, the Court hereby DENIES Motion II as to Defendants' claims for breach of fiduciary duty and constructive fraud against Future.

3.

UNFAIR AND DECEPTIVE PRACTICES AND PUNITIVE DAMAGES AGAINST FUTURE

{48} Plaintiffs' sole basis for summary judgment on Defendants' claims for unfair and deceptive practices and punitive damages against Future rests on their theory that these claims should fall with the breach of fiduciary duty and constructive fraud claims.

{49} Although Defendants partially base their unfair and deceptive practices and punitive damages claims on the underlying breach of fiduciary duty and constructive fraud, Defendants also rely on their claims for conversion, trespass to

chattels, and fraud.  Because Plaintiffs have not moved for summary judgment on the underlying claims for conversion, trespass to chattels, and fraud against Future, these claims survive and can support the claims for unfair and deceptive practices and punitive damages.  *Bhatti v. Buckland*, 328 N.C. 240, 243, 400 S.E.2d 440, 442 (1991) ("Proof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts . . . ."); N.C. GEN. STAT. § 1D-15 (2013) ("Punitive damages may be awarded . . . if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present . . . : (1) Fraud. (2) Malice. (3) Willful or wanton conduct.").

{50}　Furthermore, the Court concluded that some evidence exists to withstand summary judgment on Defendants' breach of fiduciary duty and constructive fraud claims against Future.  Therefore, the Court similarly concludes that Future is not entitled to summary judgment on the unfair and deceptive practices and punitive damages claims to the extent they are based on the underlying claims of breach of fiduciary duty and constructive fraud.

{51}　Accordingly, the Court hereby DENIES Motion II as to Defendants' claims against Future for unfair and deceptive practices and punitive damages.

4.

SPECIFIC PERFORMANCE AGAINST FUTURE

{52}　Regarding specific performance, the North Carolina Supreme Court has stated:

> The remedy of specific performance is available to compel a party to do precisely what he ought to have done without being coerced by the court. The party claiming the right to specific performance must show the existence of a valid contract, its terms, and either full performance on his part or that he is ready, willing and able to perform.

*Munchak Corp. v. Caldwell*, 301 N.C. 689, 694, 273 S.E.2d 281, 285 (1981) (internal quotation and citations omitted).  Although specific performance is an extraordinary equitable remedy, "[w]here land is the subject matter of the parties' agreement, the vendor, like the purchaser, may seek specific performance without showing the

inadequacy of a legal remedy." *Deans v. Layton*, 89 N.C. App. 358, 371, 366 S.E.2d 560, 568 (1988).

{53} Future argues that Defendants cannot seek specific performance of the Agreement and the Addendum because Defendants are not able to fully perform. Specifically, because the clubhouse burned down in a fire, Future argues that Defendants cannot uphold their end of the bargain under the Agreement, and therefore, Future should not be forced to perform either.

{54} "When the vendor's . . . estate is different from that which he agreed to convey, . . . it is plain that the contract cannot be specifically performed, according to its exact terms, at the suit of either party." *Sutton v. Davis*, 143 N.C. 474, 480, 55 S.E. 844, 845 (1906). Nonetheless, a court in equity may still compel a conveyance, with pecuniary compensation to the purchaser for the deficiency, as long as the defects do not materially change the nature of the entire agreement. *Taylor v. Bailey*, 49 N.C. App. 216, 220, 271 S.E.2d 296, 299 (1980) (quotation and citation omitted); *see also Nugent v. Beckham*, 37 N.C. App. 557, 561, 246 S.E.2d 541, 545 (1978). This doctrine may apply with equal force in cases where the defect arises after the time of contract, such as when a fire destroys a building on the property. *See Sutton*, 143 N.C. at 483–85, 55 S.E. at 846–47.

{55} In *Sutton*, the North Carolina Supreme Court recited the general principle that, "when property is destroyed by fire, the loss will fall on him who is the owner at the time." *Id.* at 483, 55 S.E. at 846. And, where there is an absolute and binding contract for the sale of real estate, the purchaser will be considered the equitable owner of the property. *Id.* Thus, "if the premises are consumed by fire subsequently to the sale, . . . the loss will fall on the purchaser, who can neither make the deterioration a ground for refusing to accept a conveyance nor rely on it as a defense to an action brought for the purchase-money." *Id.* at 484, 55 S.E. at 847. Although the contract in *Sutton* had not been completed, the court still found that the circumstances warranted applying the principle to grant specific performance where the purchaser had taken possession of the property and enjoyed the benefits of ownership.

{56}   Here, there is no evidence indicating that Defendants are incapable of performing their obligations under the Agreement and the Addendum with the exception of the destroyed clubhouse.  Further, Defendants concede that any insurance proceeds received after the fire could be accounted for as an offset to the purchase price.  Even though the contract has not been completed, the particular facts in this case, like in *Sutton*, leave the door open for the Court to grant specific performance to Defendants in its discretion.  Therefore, the Court will not foreclose this avenue of recovery for Defendants' claim at this stage.

{57}   Accordingly, the Court hereby DENIES Motion II as to Defendants' request for specific performance from Future.

5.

CLAIMS AGAINST MEDVEDEV

{58}   Plaintiffs argue that summary judgment is appropriate on all of Defendants' counterclaims against Medvedev because Medvedev did not actively participate in the alleged acts and cannot be held personally liable for Future's wrongs.

{59}   As the name implies, one of the defining characteristics of a limited liability company is limited liability for its members from harm caused by the company.  *See* S.C. CODE ANN. § 33-44-303 (2013).[2]  Thus, merely participating as a member or manager of a limited liability company will not suffice to hold the member personally liable for harm caused by the company.  *16 Jade St., LLC v. R. Design Constr. Co., LLC*, 398 S.C. 338, 346, 728 S.E.2d 448, 452 (2012); *see also Spaulding v. Honeywell Int'l, Inc.*, 184 N.C. App. 317, 322, 646 S.E.2d 645, 649 (2007).  Nonetheless, a member of a limited liability company remains individually liable for his or her own torts, even though committed while acting on behalf of the company.  *See 16 Jade St., LLC*, 398 S.C. at 349, 728 S.E.2d at 454; *see also White v. Collins Bldg., Inc.*, 209 N.C. App. 48, 51, 704 S.E.2d 307, 310 (2011).  "In addition, a member of a limited liability company, like shareholders and directors of

---

[2] Future was incorporated as a limited liability company under the laws of South Carolina.  Thus, the Court will look to the Uniform Limited Liability Company Act, as enacted in South Carolina.

corporations, may be held individually liable for the company's obligations through the doctrine of piercing the corporate veil." *Estate of Hurst v. Moorehead I, LLC*, 748 S.E.2d 568, 573 (2013); *see also Drury Dev. Corp. v. Foundation Ins. Co.*, 380 S.C. 97, 668 S.E.2d 798 (2008). [3] [4]

{60}  "It is well recognized that courts will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity." *Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985); *see also Drury Dev. Corp.*, 380 S.C. at 101, 668 S.E.2d at 800.  To apply this doctrine, courts in both North Carolina and South Carolina require allegations and proof of various similar elements. *See Glenn*, 313 N.C. at 454–55, 329 S.E.2d at 330–31; *Sturkie v. Sifly*, 280 S.C. 453, 457–59, 313 S.E.2d 316, 318 (Ct. App. 1984).

{61}  Courts in North Carolina employ the "instrumentality rule" to pierce the corporate veil:

> The instrumentality rule allows for the corporate form to be disregarded if the corporation is so operated that it is a mere instrumentality or alter ego of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State.

*Estate of Hurst*, 748 S.E.2d at 573–74 (internal quotations and alterations omitted).

{62}  To prevail under this theory, a party must allege and prove three elements:

---

[3] Because Defendants would have the Court pierce the veil of a South Carolina limited liability company, the Court must consider choice of law implications.  North Carolina courts have not resolved which state's law applies to determine whether to pierce the veil of an out-of-state company. *Strategic Outsourcing, Inc. v. Stacks*, 176 N.C. App. 247, 252–53, 625 S.E.2d 800, 804 (2006).  At least one federal court applying North Carolina law concluded that, if faced with the issue, the North Carolina Supreme Court "would adopt the internal affairs doctrine and apply the law of the state of incorporation." *Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F.Supp. 345, 349 (M.D.N.C. 1995).  However, the issue remains unsettled.  Because the Court would reach the same conclusion under the law of either North Carolina or South Carolina, the Court need not reach a determination on the choice of law issue at this stage.

[4] The Court notes that South Carolina has not expressly applied the doctrine of piercing the corporate veil to limited liability companies.  Although this adoption of corporate law seems likely, *see 16 Jade St., LLC*, 398 S.C. at 348, 728 S.E.2d at 453 (reciting the courts' preference for applying corporate law principles to limited liability companies), the resolution of this issue would not change the outcome of this Motion.

(1) Control, not mere majority or complete stock control, but complete domination, . . . so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Glenn*, 313 N.C. at 454–55, 329 S.E.2d at 330 (quoting *B-W Acceptance Corp. v. Spencer*, 268 N.C. 1, 9, 149 S.E.2d 570, 576 (1966)).

{63}    In considering whether to pierce the corporate veil, courts have looked to several factors including inadequate capitalization, non-compliance with corporate formalities, complete domination and control of the corporation so that it has no independent identity, and excessive fragmentation of a single enterprise into separate corporations. *See Glenn*, 313 N.C. at 455, 329 S.E.2d at 330–31.

{64}    In South Carolina, courts use a two-pronged test to determine whether the corporate entity should be disregarded.

The first part of the test, an eight-factor analysis, looks to observance of the corporate formalities by the dominant shareholders. The second part requires that there be an element of injustice or fundamental unfairness if the acts of the corporation be not regarded as the acts of the individuals.

*Sturkie*, 280 S.C. at 457–58, 313 S.E.2d at 318.

{65}    Although Defendants appear to argue in their brief opposing Motion II that the Court should pierce Future's veil to hold Medvedev personally liable, no such theory appears anywhere in the Answer and Counterclaims. Indeed, Defendants failed to bring forth any allegations related to the elements of piercing the corporate veil or the factors courts consider under either state's law. As a result, it does not appear that Medvedev had an adequate opportunity to respond to these new allegations through the pleadings or discovery. If Defendants learned additional facts through discovery that supported piercing the corporate veil, they could have moved to amend their pleading to add this theory of individual liability. Courts liberally allow motions to amend for this very reason. However, Defendants

never filed such a motion in this case. "[P]iercing the corporate veil is a drastic remedy and should be invoked only in an extreme case where necessary to serve the ends of justice." *Best Cartage, Inc. v. Stonewall Packaging, LLC*, 727 S.E.2d 291, 300 (2012) (internal quotations and citation omitted); *see also Drury Dev. Corp.*, 380 S.C. at 101, 668 S.E.2d at 800. In light of the facts presented and the dearth of allegations to support piercing the corporate veil, the Court will not permit Defendants' claims against Medvedev to survive under this doctrine.[5]

{66} Even though the doctrine of piercing the corporate veil may not apply, Medvedev could be held liable for any torts he committed personally. *See White*, 209 N.C. App. at 51–53, 704 S.E.2d at 310–11 (reciting established law that a party is personally liable for torts in which he actively participated even though he was acting on behalf of the company). As such, each counterclaim must be addressed in turn.

{67} First, as to the breach of contract and specific performance claims, it is not evident from the pleadings whether Defendants intended to assert these claims against Medvedev individually. However, the parties do not dispute that Medvedev was not a party to either the Agreement or the Addendum. Thus, Medvedev cannot be held individually liable for any breach thereof.[6]

{68} Defendants' second counterclaim alleges conversion, trespass to chattels, fraud, and unfair and deceptive practices based on the retention of proceeds from the sale of certain golf carts and the insurance payout from wind damage. However, as Jackson testified in his deposition, Jackson handled the sale of the golf carts and dealt with all the deposits from the insurance payout. (Jackson Dep. 127:12–128:23, 134:25–135:2, 137:10–13, Apr. 11, 2012.) Indeed, Jackson testified that

---

[5] Defendants argue that Medvedev should be estopped from raising the veil of limited liability as a defense to the counterclaims against him because Medvedev alleged individual claims against Defendants in the Complaint. However, these claims arguably alleged individual harm to Medvedev rather than solely derivative harm through Future. Although the Court dismissed Medvedev's individual claims above, the Court does not conclude that Medvedev cast down the veil of limited liability simply by asserting claims against Defendants for damage incurred both to Future and to Medvedev individually.

[6] The Court also notes that Defendants brought a counterclaim for accounting against Future. This relief is sought solely from Future rather than Medvedev individually, and thus, is not relevant here.

Medvedev only "reluctantly went along with [the sale of the golf carts]." (Jackson Dep. 128:16.) Nothing in the record refutes this division of responsibilities between Jackson and Medvedev in Future's operation, or indicates active participation by Medvedev in the alleged wrongdoing.

{69} Similarly, as to the counterclaim for unjust enrichment, Defendants merely lump Medvedev in with Future as having committed the wrongful acts, but again fail to argue how and to what extent Medvedev personally participated in the specific acts. Although the record arguably reveals knowledge of the alleged acts, Medvedev's passive awareness of Jackson and Future's actions hardly constitutes active participation. *See Oberlin Capital, LP v. Slavin*, 147 N.C. App. 52, 57, 554 S.E.2d 840, 845 (2001) (dismissing claims against directors where the complaint alleged generally that the directors were fully informed about the wrongdoing and participated in concealing it but did not allege active participation). Additionally, Defendants cannot rely simply on Medvedev's role as Future's Chief Executive Officer to support active participation. *See 16 Jade St., LLC*, 398 S.C. at 345–48, 728 S.E.2d at 452–53 (concluding that the manager of a South Carolina limited liability company, like an officer of a corporation, cannot be held personally liable solely based on his role as a manager); *see also Spaulding*, 184 N.C. App. at 322, 646 S.E.2d at 649 (stating that mere participation as a member, manager, director, or executive is insufficient to hold a member independently liable). In the absence of any evidence demonstrating Medvedev's active role in the allegedly tortious acts, the Court concludes that no issues of material fact remain as to Medvedev's personal liability for these counterclaims.[7]

---

[7] Regarding the unjust enrichment claim, the Court also notes that the alleged benefits were conferred on Future not Medvedev. Defendants allege that Plaintiffs unjustly received the Club's revenue, the proceeds from the sale of golf carts, the proceeds from the insurance payout, and the benefit of goods and services provided by vendors that went unpaid. However, it does not appear in the record that any of these benefits flowed directly to Medvedev, rather all the various proceeds and revenue were deposited in Future's accounts. Thus, even if Medvedev had actively participated in the wrongdoing, Defendants' unjust enrichment claim would likely still fail. *See Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988) ("In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party.")

{70}    Regarding the third counterclaim, Defendants allege breach of fiduciary duty, constructive fraud, and unfair and deceptive acts against both Future and Medvedev.  As discussed above, claims for breach of fiduciary duty and constructive fraud hinge on the existence of a fiduciary duty.  *See Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001).  Here, it appears Defendants argue that Medvedev owed them a fiduciary duty based on his position as a member-manager of Future during the period of time that Defendants entrusted Future with the operation of the Club.

{71}    However, generally, the duties and liabilities of managers and officers "run directly to the [company] and indirectly to its shareholders; they do not run to third parties . . . ."  *Kaplan v. O.K. Techs., LLC*, 196 N.C. App. 469, 476, 675 S.E.2d 133, 139 (2009) (quoting *Oberlin Capital, LP*, 147 N.C. App. at 57, 554 S.E.2d at 845).  Furthermore, the record fails to reveal any sort of confidence reposed personally in Medvedev outside of his position with Future.  Given their personal history, Defendants dealt mostly with Jackson over the course of their relationship with Future.  And, the only evidence of Medvedev's dominance over Defendants is his role as the Chief Executive Officer of Future, which confines his duties to Future rather than Defendants as third parties.  Without more, the Court will not impose a fiduciary duty on Medvedev individually to hold him personally liable for breach of fiduciary duty, constructive fraud, or the related unfair and deceptive acts claim, and thus, these claims fail as a matter of law.

{72}    Wherefore, the Court concludes that no genuine issues of material fact remain as to the counterclaims brought individually against Medvedev. Accordingly, the Court hereby GRANTS Motion II as to these claims, and DISMISSES all claims against Medvedev with prejudice.

C.

MOTION III

{73}    Pursuant to Rule 702 of the North Carolina Rules of Evidence, "a witness qualified as an expert . . . may testify . . . in the form of an opinion, or otherwise, if all of the following apply:"

(1) The testimony is based upon sufficient facts or data.

(2) The testimony is the product of reliable principles and methods.

(3) The witness has applied the principles and methods reliably to the facts of the case.

N.C. R. Evid. 702.

{74}   The North Carolina Supreme Court outlined "a three-step inquiry for evaluating the admissibility of expert testimony: (1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? (3) Is the expert's testimony relevant?" *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004) (citation omitted).  Therefore, under the first inquiry, the Court must assess the reliability of the expert's proffered methodology to determine admissibility.

{75}   Here, however, neither Plaintiffs nor their proffered expert, Markel, put forward any clear methodology that Markel utilized in reaching his opinions. Plaintiffs argue that, because Markel was not asked to make any definitive calculations as to damages, no such methodology is required to assess the reliability of his testimony.  The Court disagrees.  To allow Markel to testify as an expert, the Court must have some objective methodology to examine for reliability.  Otherwise, the parties would be free to elicit subjective views of the case from witnesses cloaked as experts.

{76}   Furthermore, as to the opinions proffered by Markel, some methodology appears inherent in his conclusions.  Specifically, Markel first opines that, because he could not find any uncertainties, the parties could have reasonably estimated damages resulting from breach at the time they entered into the contract.  However, Markel never fully identifies in his opinion or in his deposition how he reached this determination.  Upon direct questioning, Markel stated that he relied on a unique, personal checklist, but never offers that checklist for review or clarifies what is on the list.  (Markel Dep. 51:17–53:22, Aug. 17, 2012.)

{77}   Markel's methodology becomes even murkier on the remaining opinions. As to those opinions, Markel asserts that the reasonable damages estimate would

have been much lower than $150,000, and that the deposits were clearly disproportionate to that amount, suggesting they were intended as a disincentive to breach or to insure that damages were covered. However, in his deposition, Markel admitted that he did not perform any calculation to reach the $150,000 amount. (Markel Dep. 148:16–24, Aug. 17, 2012.) Indeed, Markel continually stated that he relied solely on his experience to reach these conclusions, and could not refer to any specific methodology or practice other than background material.

{78} Given Markel's responses, it appears that he relied more on a subjective review of the case rather than any objective methodology. And if such an objective methodology was employed, Markel failed to identify that methodology for the Court and opposing counsel to review. Without any method of proof, the Court is left to speculate about Markel's reliability as an expert witness, which this Court is not inclined to do. Therefore, the Court concludes that Markel's expert testimony is not admissible.

{79} Accordingly, the Court hereby GRANTS Motion III.

V.

CONCLUSION

{80} Based on the above, the Court hereby GRANTS Motion I, GRANTS in part and DENIES in part Motion II, and GRANTS Motion III. Wherefore, the Court DISMISSES with prejudice Future's claims against Defendants for fraud, unfair and deceptive practices, rescission, and recovery of penalty; Medvedev's claims against Defendants for fraud and unfair and deceptive acts; and all of Defendants' counterclaims against Medvedev.

SO ORDERED, this the 24th day of March, 2014.